**Michael J. D'ANTORIO, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3824.**

Court of Appeals of Alaska.

July 24, 1992.

Christine S. Schleuss, Schleuss & McComas, Anchorage, for appellant.

Cynthia L. Herren, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

COATS, Judge.

A jury convicted Michael J. D'Antorio of engaging in a scheme to defraud, a class B felony. AS 11.46.600. Superior Court Judge Joan M. Katz sentenced D'Antorio to ten years of imprisonment, with one year suspended. She placed D'Antorio on probation for a period of five years after his release from confinement. D'Antorio appeals his conviction, raising several issues. We remand.

On December 9, 1986, Alaska State Trooper (AST) Sergeant Edward Stauber observed D'Antorio in the Alaska Airlines Board Room at the Anchorage International Airport. Sergeant Stauber knew that D'Antorio was on parole, that he had previously been convicted of fraud, and that, as part of his probation, he was not allowed to possess credit cards. Sergeant Stauber learned from an employee of Alaska Airlines that D'Antorio had used a credit card to pay for membership in the Board Room.

As a result of obtaining this information, Sergeant Stauber began an investigation. Sergeant Stauber discovered from several credit card companies that D'Antorio had active credit card accounts.

Sergeant Stauber learned from D'Antorio's probation officer that D'Antorio had reported that he was residing at 5211 Mockingbird Lane. On March 23, 1987, Sergeant Stauber obtained a search warrant to search D'Antorio's residence. During the search, the police located and seized blank credit card applications, copies of completed credit card applications, newspaper articles, obituaries, credit cards, and notes detailing personal information about several people. The police found credit card applications and records in the names of George Longenbaugh, Glynn Lockwood, Ron Heisman, David Blanchett, and Craig Fowler.

Upon further investigation, the troopers discovered that the five individuals listed above were deceased. Sergeant Stauber used return addresses found on several documents to locate private mail services in Anchorage, Alaska; San Francisco, California; Denver, Colorado; and Washington, D.C. The troopers contacted the private mail services and inquired whether D'Antorio had open accounts in his own name or in the name of one of the five deceased individuals. The employees of the various mail services gave the troopers information and documents indicating who had obtained the mail boxes and the instructions concerning where the mail service was to send mail that arrived in these boxes. The troopers obtained a warrant for D'Antorio's arrest based on a violation of parole conditions for his original conviction of engaging in a scheme to defraud.

On April 30, 1987, at approximately 3:00 a.m., Officer Dale Stern, a police officer with the Huber Heights, Ohio, Police Department, stopped D'Antorio for a broken headlight. Officer Stern discovered that there was an outstanding Alaska warrant for D'Antorio. Officer Stern placed D'Antorio under arrest because of the Alaska warrant. He conducted a brief search of

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

D'Antorio's person and of the car. The car was then impounded and taken to an impound lot later that morning.

The next day, Huber Heights Detective Susan Finch and United States Secret Service Special Agent Tim Flick drove to the impound yard to search D'Antorio's car. Detective Finch testified that she conducted an inventory search according to the normal procedures for her department. She testified that the purpose of the search was to identify D'Antorio's property for safekeeping. The automobile was stuffed with luggage and merchandise, leaving only the driver's seat empty. The officers searched the car; opened and searched briefcases, bags, and other containers, many of which contained various documents; and made a general inventory of the contents which they removed and placed in custody.

Sergeant Stauber then traveled to Ohio. Sergeant Stauber testified that he went to Huber Heights to bring back D'Antorio and the items taken into custody by Ohio authorities. Upon his arrival in Ohio, Sergeant Stauber read, categorized, labeled, and indexed each document and brought the evidence back to Alaska.

D'Antorio filed motions to suppress evidence that the troopers obtained from the private mail services and from the search of D'Antorio's car. Judge Katz denied these motions. D'Antorio was ultimately convicted by a jury of engaging in a scheme to defraud.

■ D'Antorio first contends that Judge Katz erred in refusing to suppress the evidence that the police seized from his car in Ohio. As an initial matter, the state contends that D'Antorio has no standing to contest the warrantless search by the Ohio police of the car in which he was stopped. The state's position is that the car was owned by Hertz, a car rental company. The state contends that the car was overdue, that Hertz had reported the car stolen, and that Hertz gave the Ohio police permission to search the car. However, the state concedes that it did not develop this argument fully in the trial court. The defense has consistently contested the facts concerning D'Antorio's lack of a possessory interest in the car, and Judge Katz ruled that the state would have to produce sworn testimony on the disputed facts. The state never presented any testimony to develop its standing argument. Under these circumstances, we conclude that the state cannot raise the argument on appeal that D'Antorio had no standing to contest the warrantless search of the car. We have consistently held that the state cannot argue that a defendant does not have standing to raise a suppression issue when the state has not contested this issue in the court below. *Kvasnikoff v. State,* 804 P.2d 1302, 1306 n. 1 (Alaska App.1991); *Murdock v. State,* 664 P.2d 589, 595 (Alaska App.1983); *Unger v. State,* 640 P.2d 151, 156–57 (Alaska App.1982). Since the state did not develop the facts in the trial court that were necessary for Judge Katz to rule on this issue, we have no factual basis to resolve this issue. We conclude that the state cannot raise this issue on appeal.

■ The next issue we must address is whether we should apply the law of Alaska or the law of Ohio to the searches that the Ohio police conducted of the contents of D'Antorio's car. In *Pooley v. State,* 705 P.2d 1293, 1302–03 (Alaska App.1985), we adopted the analysis of the California Supreme Court as stated in *People v. Blair,* 25 Cal.3d 640, 159 Cal.Rptr. 818, 827–28, 602 P.2d 738, 747–48 (1979). In *Blair,* federal officers who were assigned to a Pennsylvania field office conducted a federal investigation in Pennsylvania of a Pennsylvania resident who was prosecuted in California on the basis of evidence that was obtained in the Pennsylvania search; the California police did not instigate or participate in the Pennsylvania search. *Id.,* 159 Cal.Rptr. at 822, 602 P.2d at 742–43. In *Pooley,* we summarized the *Blair* decision as follows:

[T]he California Supreme Court upheld admission of the fruits of a Pennsylvania seizure which was valid under federal and Pennsylvania law, even though it would have been invalid if it had occurred in California. The court reasoned that the exclusionary rule has a twofold

purpose: to deter illegal police conduct and to relieve the courts from being compelled to participate in illegal conduct. Neither goal would be served by exclusion of evidence in that case, according to the court, since Pennsylvania authorities would not (and indeed, should not) be deterred from engaging in conduct which is legal in their state, and admission of the evidence in a California court would not mean placing the judicial imprimatur on lawlessness.

705 P.2d at 1303 (citation omitted). In *Pooley,* we applied federal and California law to a search of Pooley's luggage that California law enforcement officers conducted in California when the record did not contain any evidence that the police "actions were part of any ongoing or concerted effort by Alaska and California to identify and arrest persons bringing drugs to Alaska." *Id.* at 1302–03.

Applying the *Pooley* analysis to the instant case, we conclude that federal law and the law of Ohio apply to the search incident to arrest and the original inventory search that Detective Finch conducted in Ohio since the police officers who conducted these searches were Ohio police officers who were simply following Ohio law.

■ Officer Stern, who originally arrested D'Antorio, conducted the search incident to arrest. D'Antorio's basic argument in attacking this search is based on the premise that we should apply Alaska law to this search. D'Antorio argues that under *Hinkel v. Anchorage,* 618 P.2d 1069, 1072 (Alaska 1980) *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981), Officer Stern's search of his center console and the seizure of his wallet was illegal. *See Ricks v. State,* 771 P.2d 1364, 1366 (Alaska App.1989), *vacated but aff'd in part,* 816 P.2d 125 (Alaska 1991). However, this search was clearly valid under federal and Ohio law. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *State v. Crickon,* 43 Ohio App.3d 171, 540 N.E.2d 287, *appeal dismissed,* 39 Ohio St.3d 718, 534 N.E.2d 95 (1988). We conclude that Judge Katz did not err in finding that Officer Stern's limited search was a valid search incident to arrest under federal and Ohio law—the governing law of the jurisdiction with the most significant relationship to and interest in the search.

■ Detective Finch testified that she conducted the later inventory search of the property that was in D'Antorio's car following normal procedure in Ohio. She testified that the purpose of the inventory search was to identify and hold D'Antorio's property for safekeeping. Judge Katz found that Detective Finch conducted the search according to standard police practices of her department and that the inventory search that she conducted, which included the opening of closed containers, was valid under federal and Ohio law. D'Antorio argues that we should apply Alaska law to Detective Finch's search.

Our supreme court has held that the Alaska Constitution prohibits police from entering and searching closed containers without a warrant while conducting inventory searches. *State v. Daniel,* 589 P.2d 408, 416 (Alaska 1979). However, Ohio courts, relying on federal law, allow the police to search containers which they find in impounded automobiles as inventory searches. *State v. Bronaugh,* 16 Ohio App.3d 237, 475 N.E.2d 171, 174–76 (1984) (citing *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). We conclude that Judge Katz correctly applied federal and Ohio law to the searches. *See* 2 W. LaFave, *Search and Seizure* § 5.3(a) (2d ed. 1987) (describing the law applicable to inventory searches that occur after a person has been arrested). We find Judge Katz did not err in denying this portion of D'Antorio's motion to suppress.

■ We conclude, however, that we must evaluate the investigation which AST Sergeant Stauber conducted of D'Antorio's property in Ohio under Alaska law. This was an investigation by an Alaska State Trooper who was investigating charges which arose in Alaska; Alaska has the most significant relationship to and governmental interest in Sergeant Stauber's activities in Ohio. Therefore, under our reason-

ing in *Pooley*, Alaska law should apply. 705 P.2d at 1303.

The question that Sergeant Stauber's investigation raises is whether he could go through D'Antorio's property without a warrant. This issue is discussed in LaFave, *supra*, § 5.3(b). The leading case in this area is *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). Many courts have interpreted *Edwards* to allow the police to subsequently search a defendant's possessions which are held in police custody "merely on the basis that they are doing nothing more than could have been done at the time of arrest or booking." LaFave, *supra*, § 5.3(b), at 494.

The Alaska Supreme Court addressed this issue in *Griffith v. State*, 578 P.2d 578 (Alaska 1978). In *Griffith*, the victim of an attempted robbery identified his assailant in part by the fact that the assailant was wearing "an unusual brown turban-like cap." *Id.* at 579. Griffith was wearing the brown cap when the police arrested him, but the police did not seize the cap as evidence. Jail personnel placed the cap, along with Griffith's other personal property, into a bag and stored it in a locker, according to standard jail procedure. During Griffith's trial, one of the officers who arrested Griffith realized that Griffith was wearing the hat when he was arrested and that the hat had evidentiary value. The officer asked a jail supervisor to look through Griffith's property to see whether the cap was still there. The jail officer located the cap and the police officer asked that the jail hold on to the cap. The officer obtained a court order to obtain the cap, which was introduced against Griffith at his trial. In deciding *Griffith*, the supreme court found it unnecessary to decide the state's contention that *United States v. Edwards* "validates all searches of a prisoner's personal property once that property has been taken from the prisoner for storage during his detention." *Id.* at 580 n. 3. Quoting from *United States v. Grill*, 484 F.2d 990, 991 (5th Cir.1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974), the court stated:

The underpinning of these cases is that the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated.

578 P.2d at 580. The supreme court went on to state:

We find this approach to be sound. No invasion of privacy occurred in the circumstances of this case. Officer Trudeau saw the cap at the time of Griffith's arrest.

The later telephone call to the jail supervisor merely verified the continued availability of that which had been available and in plain view to Trudeau at the time of the arrest. In the circumstances we conclude that the seizure of the cap was reasonable, and its introduction into evidence was not error.

*Id.*

Although in *Griffith* the supreme court specifically reserved the issue of whether *United States v. Edwards* allowed the police to search a prisoner's personal property once that property had been taken during an inventory search, in *Reeves v. State*, 599 P.2d 727, 737–38 (Alaska 1979), the court limited the scope of an inventory search:

In summary, we hold that a pre-incarceration inventory search is an exception to the warrant requirement, where it is conducted to further the governmental purposes recognized above and is limited to the extent necessary to respect Alaska's constitutional guarantee against unreasonable searches and seizures. The search of an arrestee's person should be no more intensive than reasonably necessary to prevent the entry of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail. Any items taken from the arrestee's possession in this search may not be further searched or opened except pursuant to a search warrant or another recognized exception to the warrant requirement appli-

cable in the circumstances. Finally, the inventory conducted shall consist of a cataloging of the arrestee's property thus seized and may not, without a specific request from the arrestee, extend to a search and inventory of the contents of *any* object, closed or sealed container, luggage, briefcase, or package. We believe that a pre-incarceration search thus limited both adequately protects the reasonable interests of the state and appropriately respects an arrestee's reasonable expectation of privacy.

Furthermore, in *Reeves*, the court noted its agreement with the following statement from *Brett v. United States*, 412 F.2d 401, 406 (5th Cir.1969):

> We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects.

*Reeves*, 599 P.2d at 734 n. 18.

Reading *Griffith* and *Reeves* together, it appears that the supreme court has rejected the proposition that a prisoner has no reasonable expectation of privacy in his personal property once that property has been taken into police custody. However, when the police have already seen and identified property of evidentiary value, the police are entitled to take a "second glance" at the property. *See Griffith*, 578 P.2d at 580 n. 2.

■ In her decision on the suppression motion, Judge Katz found that Detective Finch legitimately seized all of D'Antorio's property and subjected it to an inventory search. We have concluded, applying Ohio and federal law, that Judge Katz did not err in this determination. We have further found, however, that Sergeant Stauber's warrantless inspection of the seized property must be governed by Alaska law. Under *Griffith* and *Reeves*, the pertinent issue is whether the intensity of Stauber's warrantless search of the seized articles materially exceeded the scope of the inventory that Finch had previously conducted—in other words, whether Sergeant Stauber's actions violated a reasonable expectation of privacy that had not already been "dissipated" by Finch's earlier inspection.

This issue can properly be resolved only through a determination of the precise scope of Detective Finch's inventory and a comparison of that search with the subsequent search conducted by Stauber. Judge Katz, however, did not make any findings concerning the relative intensity of the searches conducted by Finch and Stauber. It appears that Judge Katz assumed, as a matter of law, that D'Antorio could have no continuing expectation of privacy in any of his property once Finch had inventoried it. Under *Griffith* and *Reeves*, such an assumption is incorrect.

From the testimony below, it appears that Stauber's search of D'Antonio's property may have been more intensive than Finch's prior inventory search. However, this is a factual issue, which requires findings by the trial court in the first instance. We must therefore remand this case for additional findings.

In order to provide guidance on remand, we make the following observations. The burden of proof on remand should be placed on the state, since the state has the burden of justifying any warrantless search. To the extent the state can demonstrate that Sergeant Stauber inspected articles that were plainly exposed to and observed by Finch, those articles would be similar to Griffith's turban-like cap and would clearly not be subject to suppression. On the other hand, to the extent it appears that Stauber inspected articles in closed containers that Finch had not previously opened, his conduct would clearly amount to a new and more intrusive search. Between these two extremes, it is difficult to say where the line should be drawn. *See, e.g., Anderson v. State*, 555 P.2d 251 (Alaska 1976). We leave the matter to the trial court's sound discretion.

We therefore remand this issue to the trial court to reevaluate Sergeant Stauber's search in light of this opinion. The trial court may, but is not required to, allow the parties to introduce further evidence and to further brief this issue. In the event the trial court concludes that it erroneously

allowed the state to introduce evidence at D'Antorio's trial that the court determines should have been suppressed, the court should decide whether introduction of this evidence was harmless error.

D'Antorio next contends that Judge Katz erred in failing to suppress information that the police discovered from private mail services that D'Antorio utilized. D'Antorio used private mail boxes in Anchorage, Denver, San Francisco, and Washington, D.C. The troopers contacted these mail services and, according to Judge Katz's decision, "obtained business records from them including billings, notes reflecting instructions from defendant, and applications." Apparently, two of the mail services had clauses in their service contracts which provided that: "All information provided by customer is confidential and will not be disclosed except when legally mandated." In her decision, Judge Katz found that, "A person has a reasonable expectation of privacy in his mail, whether or not there is an intermediary interposed between the postal service and the ultimate recipient." However, she concluded that the troopers had no information concerning the confidentiality portion of D'Antorio's agreement with the mail services and had no reason to believe that the records would be the subject of confidentiality agreements. She concluded that the agents for the private mail services were entitled to cooperate with the police and to reveal their business records once they had reason to believe that the boxes were being used for illegal purposes. From the discussion of the court and the parties it appears that the information that Judge Katz did not suppress was basically the name of the person who opened the box, the time the box was opened, and the directions that

were given to the mail services for forwarding the mail.[1]

In *State v. Chryst*, 793 P.2d 538, 542 (Alaska App.1990), we concluded that the police could contact a local utility company and obtain Chryst's address from all the accounts which were listed under Chryst's name. *Id.* at 539. We rejected Chryst's contention that the police action in obtaining this information violated his rights under article 1, section 14 of the Alaska Constitution, which is similar to the fourth amendment of the United States Constitution, and article 1, section 22 of the Alaska Constitution, which is the privacy provision of the Alaska Constitution and which does not have an analogous federal provision. The utility had a policy that declared that it would only provide the names, addresses, or telephone numbers of members with the approval of the member or in response to a subpoena or court order. *Id.* at 539. We stated:

> We agree with Professor LaFave and what appears to be the majority rule that a person's name and address, by themselves, do not constitute information about which a person can have a reasonable expectation of privacy which society is willing to recognize.

*Id.* at 542.

We conclude that the instant case is governed by *Chryst.* The information that the mail service employees provided was essentially who opened the account, when the account was opened, and what directions the mail service had received for forwarding the mail. We conclude that this information did not constitute information about which D'Antorio could have a reasonable expectation of privacy that society is willing to recognize. This was information concerning D'Antorio's contact with the

---

**1.** According to Judge Katz's decision, the owner of an Anchorage mail service initiated contact with law enforcement officials because she believed that the activity in D'Antorio's box was suspicious. The owner of the mail service provided the police with copies of the outside of envelopes which were sent to the mail box. The state introduced the names on the outside of the envelopes at trial. However, D'Antorio has not challenged a ruling by the trial court concerning the admission of the information on the

outside of the envelopes. Furthermore, the parties' briefs address only the issue of whether D'Antorio had an expectation of privacy in the name of the person who opened a box account, the time the box was opened, and the directions that were given to the mail services for forwarding mail. Therefore, our decision need only address the narrow issue briefed by the parties. *See Kristich v. State,* 550 P.2d 796, 804 (Alaska 1976).

mail service, and D'Antorio assumed the risk that the mail service might choose to reveal the nature of its business dealings with D'Antorio. This opinion should be read as only addressing the narrow factual circumstances of the present case. As in *Chryst*, the facts of this case do not call for this court to accept or reject cases that have provided a higher expectation of privacy in business records under state constitutional provisions. 793 P.2d at 542–43 (Bryner, C.J., concurring) (citing *People v. Chapman*, 36 Cal.3d 98, 201 Cal.Rptr. 628, 679 P.2d 62 (1984); *State v. Butterworth*, 48 Wash.App. 152, 737 P.2d 1297 (1987)); *cf. United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (no expectation of privacy in financial or bank records). Judge Katz's ruling protected D'Antorio's interest in the privacy of his mail. We accordingly affirm Judge Katz's decision.

■ D'Antorio next asserts that Judge Katz erred in allowing the state to introduce evidence which referred to individuals other than Longenbaugh, Lockwood, Heisman, Blanchett, and Fowler, the names D'Antorio was charged with fraudently obtaining and using credit under. We conclude that Judge Katz could properly have allowed the state to introduce this evidence to show that D'Antorio had a continuing plan of collecting information on individuals other than the individuals listed in the indictment to complete the picture of the scheme to defraud. *See Braham v. State*, 571 P.2d 631, 640 (Alaska 1977) (evidence "had the permissible effect of completing the picture or setting the stage of the crime"), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978).

D'Antorio argues that Judge Katz erred in allowing testimony that D'Antorio was in custody in Ohio. At trial, Detective Finch testified that she recognized D'Antorio as the person who was in custody in Ohio, and Sergeant Stauber testified that he went to Ohio to pick up D'Antorio and the evidence. We conclude that Judge Katz did not abuse her discretion in allow-

ing this testimony. In context, we fail to see how D'Antorio was unduly prejudiced. *See State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023, 1050 (1980) ("The fact that Gretzler was arrested by somebody prior to trial was obvious to the jury. We are unable to perceive how testimony that Gretzler was held in another state on Arizona indictments would damage his case before the jury."), *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■ D'Antorio next contends that Judge Katz erred in refusing to allow him to introduce a statement by his parole officer that D'Antorio had said that Michael Knight resided at the Mockingbird Lane address with him. Judge Katz allowed the state to elicit testimony from Mr. Lonzo Henderson, D'Antorio's parole officer, that D'Antorio had listed the Mockingbird Lane address as his official residence.[2] D'Antorio claims that Judge Katz erred in not allowing him to admit the remainder of the hearsay statement in which he had said that he resided at the Mockingbird Lane address with Michael Knight. D'Antorio's defense at trial was that the scheme to defraud was perpetrated by someone else who had access to the Mockingbird residence. He wanted to show that Michael Knight, John Finley, and William Crouse were possible suspects. Two defense witnesses subsequently testified that Knight, Finley or Crouse also resided or often visited at the Mockingbird Lane residence. D'Antorio also introduced evidence that two credit cards in the name of Michael Knight were found in the Ohio automobile search along with several credit card receipts bearing Knight's name. D'Antorio contends that it was critical to his defense to show that Knight was present both at Mockingbird Lane and in Ohio. D'Antorio avers that Judge Katz's ruling violated his constitutional right to confront the witnesses against him and to due process of law. He also argues that Judge Katz erred in not allowing the statement under Alaska Evidence Rule 106.[3]

---

**2.** The jury was not told that Henderson was a parole officer or that D'Antorio was a parolee.

**3.** Evidence Rule 106 provides:

Although we see the issue as close, we conclude that Judge Katz did not abuse her discretion in not allowing D'Antorio to introduce the remainder of D'Antorio's statement that he lived at the Mockingbird Lane address with Michael Knight. D'Antorio's statement to the parole officer was an admission that he lived at that address. His hearsay statement that Michael Knight also lived there would normally not be admissible. We believe that Judge Katz could properly determine that the statement was severable and that it was not necessary to admit the second part of the statement under Evidence Rule 106, and that the failure to admit the statement did not violate D'Antorio's constitutional rights. We find no error.

D'Antorio next argues that Judge Katz erred in refusing to allow him to introduce past convictions of Finley and Crouse. After defense witnesses testified to the fact that Finley and Crouse had been present at the Mockingbird Lane address, D'Antorio sought to introduce certified copies of convictions showing that Crouse had been convicted for engaging in a scheme to defraud and that Finley had been convicted of forgery, passing bad checks, and attempting to obtain money by false pretenses. In her ruling, Judge Katz told the parties that she had had Crouse's presentence report faxed from Fairbanks.[4] Judge Katz concluded that the prior convictions were not similar and were not close in time. She concluded that they had little probative value. Judge Katz did not abuse her discretion in not admitting these prior records. D'Antorio was attempting to show that because Finley and Crouse had prior convictions, they were likely to have engaged in the particular criminal activity with which D'Antorio was charged. Judge Katz could properly determine that this proposed evidence had little probative value. We find no error.

D'Antorio next contends that Judge Katz erred in allowing the state to introduce evidence concerning chargeoffs that credit card companies had made against D'Antorio's accounts. At trial, an employee of the Credit Bureau of Alaska testified that a chargeoff was a record that a credit card company had written off a debt as uncollectable. Apparently, at grand jury, an employee of the Credit Bureau of Alaska testified that D'Antorio had $57,000 in chargeoffs. D'Antorio requested a protective order against admitting this testimony. Judge Katz denied the protective order and ruled that the state could admit this evidence at trial. D'Antorio argues that this was error. He argues that the evidence was inadmissible as a prior bad act. *See* A.R.E. 404, 403. The state contends that the evidence was admissible to show that at some point it would become impossible for D'Antorio to get further credit in his own name since he would have a bad credit record. This would explain D'Antorio's motive to obtain credit cards in other names so that he could continue his credit card fraud.

However, at trial, a different employee of the Credit Bureau of Alaska testified than had testified before the grand jury. This employee testified only that, as of March 1987, D'Antorio's account showed $6837 in chargeoffs. It therefore does not appear that the testimony of which D'Antorio complains was admitted at trial. Since the testimony admitted at trial differs so

---

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

In *Stoneking v. State*, 800 P.2d 949, 951–52 (Alaska App.1990) (citations omitted), this court stated:

The limited purpose of A.R.E. 106 is to allow a party to admit omitted portions of a partially admitted statement only when and only to the extent that the omitted portions are necessary to provide context to the admitted por-

tions, or to explain or clarify them. The rule does not make admissible statements that would otherwise be inadmissible; it is meant only to allow contemporaneous admission of evidence that would ordinarily not be admissible until later stages of the trial.

4. D'Antorio argues that Judge Katz erred in obtaining the presentence report *ex parte.* However, D'Antorio never objected to this procedure and we find no prejudice. *See Egelak v. State,* 438 P.2d 712, 715 (Alaska 1968). We do not find reversible error.

significantly from the testimony of which D'Antorio complains, we decline to decide this issue.

D'Antorio next contends that Judge Katz erred in overruling his objections to the state's assertion in argument that D'Antorio's scheme may have been more successful than Credit Bureau of Alaska records showed. We have reviewed the prosecutor's remark in context, and conclude that Judge Katz did not err in overruling D'Antorio's objection.

REMANDED.